UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


NEXEN PETROLEUM U.S.A., INC.                CIVIL ACTION
AND NEXEN OFFSHORE U.S.A., INC.

VERSUS                                      NO.  06-3043


SEA MAR DIVISION OF POOL                    SECTION "R" (4)
WELL SERVICES CO.


**ORDER AND REASONS**

Before the Court are defendant Sea Mar's motion for summary judgment and plaintiffs Nexen Petroleum and Nexen Offshore's cross-motion for partial summary judgment.[1] For the following reasons, the Court GRANTS in part and DENIES in part Sea Mar's motion for summary judgment; and GRANTS plaintiffs' motion for partial summary judgment.

_____

[1] Along with its motion for summary judgment under Federal Rule of Civil Procedure 56, Sea Mar also filed a motion to dismiss under Rule 12(b)(6). In so doing, it presented matters outside the pleadings that the Court has considered. Accordingly, the Court treats Sea Mar's motion to dismiss "as one for summary judgment [to be] disposed of as provided in Rule 56." Fed. R. Civ. P. 12(b); *see also Bolen v. Dengal*, 340 F.3d 300, 312 (5th Cir. 2003).

1

I.    **BACKGROUND**

This tort suit arises from the allision of a merchant supply vessel with a semi-submersible drilling rig, both of which were engaged in an offshore drilling operation in the Gulf of Mexico.

The plaintiffs, Nexen Petroleum U.S.A. Inc. and Nexen Petroleum Offshore U.S.A. Inc., are corporate affiliates, ultimately owned by Nexen Inc., a publicly traded, Canadian energy company. Nexen Offshore holds a federal lease that entitles it to explore for and extract oil and gas offshore of Louisiana. Nexen Petroleum operates this lease.

On August 26, 2004, Nexen Petroleum entered into a Master Time Charter with defendant Sea Mar Division of Pool Well Services Company for services in support of its drilling operations. On January 31, 2006, Nexen Petroleum and Sea Mar entered into a Short Form Time Charter for the use of the M/V *Cape Hope* at Nexen Offshore's Aspen 5 site. The Master Time Charter governed the use of the vessel and contained exculpatory provisions addressing the parties' scope of liability in the event of an accident.

Nexen Petroleum also contracted with Global Santa Fe Drilling Company for Global to use its semi-submersible rig, the *Arctic I*, to drill the well at the Aspen 5 site. And it further contracted with Baroid Industrial Drilling Products for a supply

2

of drilling mud. Baroid retained ownership of the mud, but Nexen Petroleum states that it was financially responsible for any lost, damaged, or contaminated mud.[2]

On April 9, 2006, the *Cape Hope* was supplying drilling fluids to the *Arctic I* via hoses between the vessel and the rig. According to a Nexen accident report, when an engineer aboard the *Cape Hope* observed the drilling fluids leaking onto the ship's deck, he accidentally shut the fuel line to the vessel's engines, thinking he was closing the valve to the fluid holding tanks. Without any power to hold its position against the current, the *Cape Hope* allided with the *Arctic I*, causing damage to the rig's superstructure.[3]

Global determined that the *Arctic I* would have to be moved to a shipyard for repairs, which resulted in suspension of drilling operations at the site. Operations personnel then inserted two cement plugs in the well hole and returned the majority of the drilling equipment to shore. Nexen Petroleum alleges that although Global had responsibility for covering the cost of repairs to the *Arctic I*, it agreed to pay the charter

---

[2] *See* Decl. of W. H. Bagley, Nexen Petroelum Drilling Mgr., Dec. 12, 2006, Rec. Doc. 36-6 at 3.

[3] *See* Nexen Risk Identification and Accident Report, Apr. 17, 2006, Pl.'s Ex. A-4, Rec. Doc. 19-4 at 18-19.

3

hire at a "shipyard repair rate" while the rig underwent repairs.[4]

The plaintiffs claim that the *Cape Hope* was unseaworthy and that its crew was improperly trained and incapable of safely operating the vessel. They further contend that Sea Mar was grossly negligent in providing drilling support services under its Master Time Charter with Nexen Petroleum. In their complaint, Nexen Petroleum and Nexen Offshore do not allege that they have each suffered distinct harms. They claim generally damages for "increased and additional expenses, deferred and/or lost production, increased, additional and/or unabsorbed overhead, and other physical and economic damages."[5] In their briefs, however, the plaintiffs distinguish between their claims. Nexen Petroleum seeks to recover the daily hire rate it paid Global while the *Artic I* underwent repairs, unabsorbed overhead expenses incurred during suspension of drilling, and expenses for lost and contaminated drilling mud. Nexen Offshore claims a proprietary interest in the well itself and seeks to recover for physical

---

[4] *See* Global-Nexen Petroleum Letter of Agreement, May 31, 2006, Pl.'s Ex. A-1, Rec. Doc. 19-3 at 1.

[5] Pl.'s Am. Compl., Rec. Doc. 18 ¶ 13.

damage to the well hole and deferred production revenue.[6]

## II. Jurisdiction and Legal Standards

### A.    Jurisdiction

This case concerns a charter party agreement for a vessel to provide offshore drilling support services and an accident that occurred on navigable waters in the course of maritime activities. Therefore, it falls within the Court's admiralty jurisdiction under 28 U.S.C. § 1333 (2006). General federal maritime law applies.

### B.    Legal Standard

Summary judgment is appropriate when there are no genuine issues of material facts, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To grant summary judgment, the Court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagra Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

---

[6] *See* Pl.'s Mem. Opp'n Def.'s Mot. Summ. J., Rec. Doc. 19 at 5–6.

The moving party bears the burden of establishing that there are no genuine issues of material fact. *See Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex*, 477 U.S. at 322-25). To do so, it may simply point out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim or defense. *See Celotex*, 477 U.S. at 325; *Lavespere*, 910 F.2d at 178. The burden then shifts to the nonmoving party, who must set out specific facts showing that a genuine issue exists by submitting or referring to evidence already in the record, not resting upon mere allegations in the pleadings. *See Triple Tee Golf*, 485 F.3d at 261 (citing *Celotex*, 477 U.S. at 321-25; *Anderson*, 477 U.S. at 255-57).

**III. Discussion**

**A.   Sea Mar's Motion for Summary Judgment**

Sea Mar moves to dismiss all of the plaintiffs' claims on two grounds. First, it argues the general rule articulated in *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927), that one may not recover for economic loss resulting from physical damage to property in which one has no proprietary interest precludes the plaintiffs from recovering damages resulting from the allision. Second, Sea Mar contends that the Master Time Charter insulates it from liability for damages arising out of

the allision. The Court addresses Sea Mar's arguments with respect to the distinct claims of each plaintiff in turn.

### 1.  The *Robins Dry Dock* Rule

*Robins Dry Dock* established the principle that a charterer may not recover from a third party for loss of use of a chartered vessel damaged by the third party, as the charterer does not own the vessel and suffers no damage to its property. In *Robins*, a ship repair company damaged a steamship's propeller during the course of ordinary maintenance for which the owner had arranged. At the time, the vessel was under charter to the plaintiff, and the repairs delayed the charterer's voyage. The charterer sued the dry dock for loss of use, but the Supreme Court rejected its claim. The Court concluded that since the charterer was not a party to the maintenance contract, it could not sue for its breach. It also dismissed the charterer's theory of recovery in tort because the injury was not to its property but rather to the property of the vessel owner. "[A] tort to the person or property of one man does not make the tort-feasor liable to another merely because the injured person was under a contract with that other unknown to the doer of the wrong," the Court explained. *Id.* at 309.

The general rule in the Fifth Circuit is that "physical damage to a proprietary interest" is a "prerequisite to recovery

for economic loss" in cases of unintentional maritime torts. *Louisiana ex. rel. Guste v. M/V Testbank*, 752 F.2d 1019, 1020 (5th Cir. 1985) (*en banc*), *cert. denied*, 477 U.S. 903 (1986). The Fifth Circuit recently reaffirmed this pronouncement. *See In re Taira Lynn Marine Ltd. No. 5*, 444 F.3d 371 (5th Cir. 2006). Nexen Petroleum and Nexen Offshore have not alleged that Sea Mar committed an intentional tort. Thus, the principle in *Robins Dry Dock* as expounded by the Fifth Circuit in *Testbank* and later cases is the governing law.

   2.   **Nexen Petroleum's claim arising from the *Arctic I***

   Nexen Petroleum seeks to recover the daily hire rate it paid Global while the *Arctic I* was under repair, as well as unabsorbed overhead costs incurred during its suspension of operations. These losses, however, do not result from physical damage to property that Nexen Petroleum owns.[7] A proprietary interest in damaged property is a prerequisite to recovery under Fifth Circuit law. *See Testbank*, 752 F.2d at 1020. Thus, unless an exception to *Robins Dry Dock* applies, under the "unmistakable law of this circuit," *Taira Lynn Marine*, 444 F.3d at 377, Sea Mar would be entitled to summary judgment on these claims.

   Nexen Petroleum argues that its contractual relationship

_____

   [7] *See* Pl.'s Resp. Def.'s Stmnt. Uncontested Facts, Rec. Doc. 46 ¶ 10.

with Sea Mar falls within an exception to *Robins Dry Dock* and
*Testbank*. It contends that Sea Mar, by virtue of its charter
agreement with Nexen Petroleum, knew that any harms resulting
from its negligence would result in damage to Nexen Petroleum as
operator of the lease. Since its damages were foreseeable, Nexen
Petroluem argues, the *Robins Dry Dock* rule against recovery for
pure economic loss or impairment of contractual rights is
inapplicable.

In support of this argument, Nexen Petroleum makes much of
Justice Holmes's observation in *Robins Dry Dock*, 275 U.S. at 309,
that the charterer who sought to recover economic losses in that
case was "unknown to the doer of the wrong," the negligent
shipyard. In this case, the plaintiff argues, the putative
tortfeasor, Sea Mar, had to know the identity of the injured
charterer, Nexen Petroleum, because of the Master Time Charter.
Nexen Petroleum has identified a difference in the relationship
between three relevant players in this case – Sea Mar, Global,
and itself – and those in *Robins Dry Dock* – the negligent
shipyard, the steamship owner, and the plaintiff charterer.
Unlike in *Robins*, in which the negligent shipyard had no
contractual relationship with the charterer whose contractual
rights were impaired, in this case, Sea Mar had a contract with
Nexen Petroleum. Indeed, it was participating in the drilling

9

operation during which the allision occurred at Nexen Petroleum's request.

The Fifth Circuit, however, has not interpreted *Robins* as containing any special "foreseeability" exceptions to the general rule. In *Testbank*, 752 F.2d at 1023, it noted that "although the dry dock company [in *Robins*] did not know of the charter party when it damaged the propeller, delay losses by users of the vessel were certainly foreseeable. Thus *Robins* was a pragmatic limitation imposed by the Court upon the tort doctrine of foreseeability." The requirement that a plaintiff must suffer physical damage to its property in order to recover economic losses as opposed to economic losses derived from damage to a third party's property prevents entities from incurring potentially limitless liability for economic consequences that could be said to ripple out from one incident. *See id.* at 1025. The *Testbank* court noted that "[t]he bright line rule of damage to a proprietary interest . . . has the virtue of predictability with the vice of creating results in cases at its edge that are said to be 'unjust' or 'unfair.'" *Id.* at 1029. But the Court found that "[d]enying recovery for pure economic losses is a pragmatic limitation on the doctrine of foreseeability . . . [that is] both workable and useful." *Id.* at 1032.

In later cases, the Fifth Circuit has expounded on its pronouncement in *Testbank* that the rule that physical damage to a proprietary interest is a limitation on the nebulous concept of "foreseeability." In *Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 772 F.2d 1217, 1222 (5th Cir. 1985), the court explained that what is relevant for the purposes of determining whether a plaintiff can recover for a particular kind of loss is not whether the harm was "'foreseeable' or 'remote' in a factual sense but rather 'the character of the interest harmed' for which the plaintiff seeks relief." As the *Taira Lynn Marine* court recently and unequivocally stated, "[w]hile other jurisdictions may have abandoned or relaxed the bright line rule of *Robins* and *Testbank*, this circuit 'has not retreated from *Testbank's* physical injury requirement.'" 444 F.3d at 379 (quoting *Reserve Mooring Inc. v. Am. Commercial Barge Line*, 251 F.3d 1069, 1071 (5th Cir. 2001)).

Significantly, the Fifth Circuit recently refused to endorse a "geographic exception" of foreseeability to the *Robins Dry Dock* and *Testbank* rule. In *Taira Lynn Marine* the court flatly rejected the district court's recognition of such an exception, noting that it had previously reversed a "district court's conclusion that *Testbank* 'is merely an application of the general requirement that damage be foreseeable to be recoverable in

11

tort.'" 444 F.3d at 379 (quoting *Reserve Mooring Inc. v. Am. Comm. Barge Line*, 251 F.3d 1069, 1071 (5th Cir. 2001)). This Court declines the plaintiffs' invitation to carve out a contractual exception based on similar arguments about foreseeability. Recognition of such an exception here would be especially problematic because Sea Mar and Nexen Petroleum addressed issues of Sea Mar's liability for causing damage to the property of others in the time charter and generally sought to insulate Sea Mar from liability. Thus, to the extent the parties foresaw the problem, they agreed to shift the losses in the opposite direction from the one Nexen Petroleum argues for here.

Nexen Petroleum also argues that it falls within a "loss-shifting" exception to *Robins Dry Dock* and *Testbank* because it paid Global a daily charter hire while the *Arctic I* underwent repairs.[8] In *Amoco Transport Co. v. S/S Mason Lykes*, 768 F.2d 659, 668 (5th Cir. 1985), the Fifth Circuit recognized that a third party who does not have a proprietary interest in physically damaged property of another could nonetheless recover those losses under an agreement that "contractually shifts the risk of economic loss, which would normally fall upon the property owner, to a third party." An example of such an

---

[8] *See* Pl.'s Mem. Opp'n Def.'s Mot. Summ. J., Rec. Doc. 19 at 11–13.

12

agreement is "a clause providing that charter hire continues to run while a vessel is disabled." *Id.*

In endorsing this principle, *the Amoco Transport* court cited with approval the Fourth Circuit's decision in *Venore Transportation Co. v. M/V Struma*, 583 F.2d 708 (4th Cir. 1978), which involved similar facts to this case. In *The Struma*, the plaintiff time charterer sought to recover the hire it paid to the vessel owner under their charter agreement while the chartered ship underwent repairs for damages resulting from an allision caused by the defendant. The court held that either the owner or the charter, "but not both, may claim damages for loss of use depending upon the charter's placement of the risk of loss of use." *Id.* at 711. In so doing, it explained that "payment for loss of use of the damaged vessel is a conventional item of recovery" for vessel owners "and the fact that the charter party has transferred the risk of loss of use from the owner to the time charterer should not extinguish the right to a recovery of a traditional item of damages." *Id.* at 710-11. Such an allowance is consistent with *Robins Dry Dock*, the court explained, because these damages are not "remote" since they originate with the property owner, and limiting the tortfeasor's liability for loss of use avoids the problem of double recovery. *See id.*

13

The Fifth Circuit in *Amoco Transport* echoed this reasoning. *See* 668–69. It also buttressed it, explaining that a charterer's claim for loss of use or hire fee arising out of a burden-shifting agreement "is in the nature of an equitable subrogation of [the vessel owner's] rights. So viewed, there would be no double recovery, much less runaway recovery . . . [because] 'subrogation recoveries involve only one loss . . . there is no potential in such cases for a chain of recoveries . . . .'" *Amoco Transp.*, 768 F.2d at 668 (quoting *Prosser and Keeton on the Law of Torts* § 129 1001 (5th ed. 1984)). In both cases, the courts noted that, but for the burden-shifting agreements, the vessel owner would be able to recover for its loss of use as measured by charter hire or freight from the defendant. *See id.* at 669; *The Struma*, F.2d at 710 (noting that loss of use is a "conventional item of recovery"). Moreover, *The Struma* court noted that unless a charterer may recover the fee it has continued to pay for a disabled ship, "the offending vessel . . . would never be required to pay at all." 583 F.2d at 710. Thus, a loss-shifting exception to *Robins Dry Dock* helps to achieve optimal deterrence of negligent behavior.

Similar to the facts in the *The Struma*, Nexen Petroleum and Global shifted the burden of economic loss for damage to the *Arctic I* to Nexen Petroleum. Nexen Petroleum paid a "Shipyard

14

Repair Rate" of $154,000 per day while the *Arctic I* was laid up in dry dock.[9] Therefore, it falls within the loss-shifting exception to *Robins Dry Dock* that the Fifth Circuit recognized in *Amoco Transport*.

The Court notes that the contract governing the parties' relationship at the time of the incident in question contained no such loss-shifting provision. That contract limited Nexen Petroleum's obligation to paying a repair rate to Global to eight hours during any one occurrence.[10] Here, Global's rig was under

---

[9] Global–Nexen Petroleum Letter of Agreement, May 31, 2006, Rec. Doc. 19-3 at 1.

[10] The repair rate provision (Paragraph 706) as amended by the January 25, 2006 Letter of Agreement reads as follows:

The Repair Rate will apply to each hour up to a total of eight (8) hours during any one instance and up to a maximum of twenty four (24) hours during any thirty (30) day period in which the Drilling Unit is inoperable and is shut down and not operating due to a breakdown of Contractor's [Global's] items (except as provided in Paragraphs 606 [drilling site and access], 705 [standby rate] and 707 [force majeure] and excluding in-hole equipment and any Operator's Items furnished by Contractor at Operator's request). For any time in excess of that specified above, no compensation will be paid to Contractor. Changing swivel packing, cutting drill line, servicing the rig, testing BOP's, changing pump liners, recalibrating instrumentation and repairing Operator's items shall not be included in computing the number of hours of shutdown time.

Rec. Doc. 19-3 at 23.

repair for approximately two months.[11] Thus, the initial contract did not shift the risk of extended repairs to Nexen Petroleum when it was entered and contained no such provision when the accident occurred.[12] Nexen Petroeluem agreed to pay the shipyard repair rate after the allision, as is evidenced by the May 31, 2006 letter of agreement from Global to Nexen Petroleum.

In determining whether Nexen Petroleum fits within the loss-shifting exception, the Court finds no principled reason why the parties' agreement to transfer the burden to Nexen Petroleum after the fact should matter. Whether the parties did so *ex ante* or *ex post*, the claim is in the nature of an equitable subrogation to *Global's* rights. Global has already received its hire, and thus there is no threat of double recovery. Therefore,

_____

[11] The May 31, 2006 Letter of Agreement between Global and Nexen Petroleum states that shipyard repairs commenced on April 23, 2006, and Nexen Petroleum states in its briefs that the *Arctic I* did not resume operations at the Aspen 5 site until July 4, 2006. *See* Rec. Doc. 19-3 at 1; Rec. Doc. 19 at 6.

[12] Further, the "Shipyard Repair Rate" agreed to after the fact was less that the contractually agreed upon "Repair Rate," to which Nexen Petroleum cites as evidence of a burden-shifting clause creating a common adventure. In its final reply brief, Nexen Petroleum cites to paragraph 706, the "Repair Rate," of the Global-Nexen Petroleum contract as evidence of its obligations to pay the daily rate while the *Arctic I* underwent repairs. *See* Rec. Doc. 42 at 5. But as noted above, this provision relates to rates for the temporary inoperability of Global's equipment. Neither paragraph 706 nor the rate schedule includes the term "Shipyard Repair Rate."

Nexen Petroleum may recover the hire it paid Global while the *Arctic I* was laid up in dry dock, unless recovery is foreclosed under the contract between Sea Mar and Nexen Petroleum. *See* discussion *infra*.

But Nexen Petroleum may not recover for unabsorbed overhead costs. Both the Fifth and Fourth Circuits explained that a charterer may recover its paid hire only by way of transfer of the owner's claim that originates in the *owner's* physically damaged property. *See Amoco Transp.*, 768 F.2d at 669 (permitting recovery of "those actual, out-of-pocket expenses . . . directly occasioned by the collision"); *The Struma*, 583 F.2d at 711 (holding that the charterer "is entitled to what the owner would have been entitled to recover had [hire] been suspended"). *Robins Dry Dock* forecloses any claims to lost profits by the charterer. Unabsorbed overhead costs are equivalent to lost profits in that they do not stem from the vessel owner's rights, and under *Robins Dry Dock* and *Testbank* they cannot be said to be proximately caused by the allision. Accordingly, Sea Mar is entitled to summary judgment on Nexen Petroleum's unabsorbed overhead claim.

Sea Mar further argues that even if Nexen Petroleum can recover under a loss-shifting exception to *Robins Dry Dock* and *Testbank*, an exculpatory provision of the Master Time Charter bars Nexen Petroleum's claims for its lost charter hire. Under

17

the terms of the charter agreement, Sea Mar is the "owner," and Nexen Petroleum is the "charterer." The exculpatory provision provides, in pertinent part, that:

> NEITHER OWNER, ITS OFFICERS, DIRECTORS, EMPLOYEES, THE VESSEL, HER OWNERS, OPERATORS, MASTER, AND CREW, NOR THE UNDERWRITERS OF ANY OF THE FOREGOING SHALL HAVE ANY RESPONSIBILITY OR LIABILITY FOR ANY CLAIM INVOLVING DAMAGE TO OR LOSS OF ANY PROPERTY, DRILLING RIGS, VESSELS, CARGO AND/OR EQUIPMENT OF CHARTERER, CHARTERER'S OTHER SUBCONTRACTORS, CHARTERER'S CUSTOMERS OR INVITEES . . . AND CHARTERER SHALL DEFEND, INDEMNIFY, AND HOLD HARMLESS OWNER . . . FROM AND AGAINST ANY SUCH CLAIM . . . .[13]

Sea Mar contends that Nexen Petroleum cannot recover the charter hire for the *Arctic I* because Global was a subcontractor. The intent of the charter, Sea Mar argues, was to absolve it from liability for damage to the property of other entities in the same position as itself vis-à-vis Nexen Petroleum. In support of this claim, Sea Mar argues that since Nexen Petroleum was operating the lease under a contractual agreement with Nexen Offshore, and Nexen Petroleum contracted with Global, Global was in fact Nexen Petroleum's subcontractor.[14] Further, Nexen Petroleum's claim stems from damage to Global's rig. Indeed, it can assert such a claim under a loss-shifting theory only because

---

[13] Global-Nexen Petroleum Master Time Charter ¶ 14, Rec. Doc. 19-4 at 4 (emphasis in original).

[14] *See* Def.'s Reply Mem. Supp. Mot. Summ. J., Rec. Doc. 40 at 12; Def.'s Sur Reply Mem. Opp'n Pl.'s Cross Mot. Summ J., Rec. Doc. 48 at 6-7.

of damage to the *Arctic I*. Thus, the exculpatory provision's broad wording about "claims *involving* damage" to other subcontractor's property would appear to shield Sea Mar from liability. The Court also notes that the term "*other* subcontractors" in the exculpatory provision arguably implies that the parties to the charter agreement understood Sea Mar to be Nexen Petroleum's subcontractor. This wording is significant because it suggests that Global, which appears to be in a similar relationship to Nexen Petroleum as Sea Mar, is in fact a subcontractor.

Nexen Petroleum, on the other hand, maintains that Global is not its *sub*contractor but its *contractor* and therefore the exculpatory clause does not apply in this context.[15] In support of this assertion, Nexen Petroleum points to its contract with Global, which defines Global as an "contractor."[16] It further asserts that Global did not take a "'portion' of a contract from the principal contractor. It took on the *whole* of the work — the

---

[15] *See* Pl.'s Mem. Opp'n Def.'s Mot. Summ. J., Rec. Doc. 19 at 16–19.

[16] *See* Global–Nexen Petroleum Letter of Agreement, May 31, 2006, Rec. 19-3 at 1; *see also* Global–Nexen Petroleum Daywork Drilling Contract, October 28, 2004 ¶ 106 "Contractor's Status," Rec. Doc. 19-3 at 4 (stating taht "[c]ontractor shall be an independent contractor in performing obligations" under the agreement).

Operations."[17] This statement is puzzling given that Nexen
Petroleum, not Global, hired Sea Mar to provide services to
drilling operations and contracted with Baroid Industrial
Drilling Products for the provision of drilling mud. Still, Nexen
Petroleum has at least raised an issue of fact about intent of
the parties to the Master Time Charter and the actual nature of
its relationship with Global and Nexen Offshore.[18] Accordingly,
Sea Mar is not entitled to summary judgment on this issue.

    **3.   Nexen Petroleum's claim arising from the drilling mud**

    Nexen Petroleum also seeks to recover for damage to the
drilling mud used in operations at the Aspen 5 site. Nexen
Petroleum concedes that it does not own the mud but maintains
that it nonetheless has a proprietary interest in the mud because
it was "financially responsible for . . . [the] mud lost or
damaged as a result of the allision."[19] To demonstrate that it
has a proprietary interest in the mud sufficient to meet the
requirements of *Robins Dry Dock* and *Testbank,* Nexen must show
that it had (1) actual possession or control; (2) responsibility

---

    [17] Pl.'s Mem. Opp'n Def.'s Mot. Summ. J., Rec. Doc. 19 at
18.

    [18] The Court analyzes the relationship between Nexen
Petroleum and Nexen Offshore in Part III.A.4.

    [19] Decl. W.H. Bagley, Nexen Petroleum Drilling Mgr., Dec.
12. 2006, Rec. Doc. 36-6 at 3.

for repair; and (3) responsibility for maintenance of the mud. *See IMTT-Gretna v. SS Robert E. Lee*, 993 F.2d 1193, 1194 (5th Cir. 1993) (citing *Texas Eastern Transmission Corp. v. McMoRan Offshore Exploration Co.*, 877 F.2d 1214, 1225 (5th Cir. 1989)). Put differently, if Nexen Petroleum shows that it has interests in the mud similar to the interests it would acquire in a vessel from a demise charter or in real estate from a lease, then it can satisfy the requirements of *Robins Dry Dock*. *See Louisville & Nashville R.R. Co. v. M/V Bayou Lacombe*, 597 F.2d 469, 473-74 (1979).

Nexen Petroleum has failed to make even a *prima facie* case that it has the requisite proprietary interest in the mud to recover in tort. It does not mention the drilling mud in its complaint, and it does not allege elsewhere that it had actual possession or control over the mud. Further, it acknowledges that Baroid Industrial Drilling Products, the supplier of mud services, owns the mud.[20] Since Nexen Petroleum has failed to raise any genuine issues of material fact about whether it satisfies the Fifth Circuit test for a sufficient proprietary interest in the mud, Sea Mar is entitled to summary judgment on this claim.

------

[20] *See id.*

**4.   Nexen Offshore's claims arising from the well**

Nexen Offshore seeks to recover the cost of plugging its well hole and deferred production revenue resulting from the suspension of drilling operations. Sea Mar advances arguments against Nexen Offshore's claims similar to those it made against the claims of Nexen Petroleum. In one instance, it denies that Nexen Offshore has a proprietary interest in the well.[21] But it points to no evidence to support this allegation and elsewhere agrees that Nexen Offshore is entitled to explore for and produce minerals at the Aspen 5 site and holds an offshore exploration lease.[22] The Fifth Circuit has found an offshore well owner to have a proprietary interest in its well sufficient to satisfy the requirements of *Robins Dry Dock* and *Testbank*. *See Corpus Christi Oil & Gas Co. v. Zapata Gulf Marine Corp.*, 71 F.3d 198, 202 (5th Cir. 1995).

Sea Mar next alleges that the allision did not result in physical damage to the well hole. It relies on the sworn affidavit of W. H. Bagley, Nexen Petroleum's drilling manager, that the insertion of the plugs merely "delays the production of

---

[21] *See* Sea Mar's Stmnt. of Contested Material Facts ¶ 9, Rec. Doc. 29-2 at 2.

[22] *See* Sea Mar's Stmnt. of Uncontested Material Facts ¶¶ 3, 4, Rec. Doc. 38-2 at 1-2.

hydrocarbons, costs money to install, and costs money to remove."[23] But Sea Mar overlooks Bagley's statement that "industry standards and safety concerns" motivated the plugging of the hole.[24] The plaintiffs argue that insertion of the plugs was necessary "to secure the reservoir and to protect against the escape of hydrocarbons."[25] Moreover, "structural changes" to a well hole can constitute recoverable physical damages. *See Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1473 (5th Cir. 1991).

The Fifth Circuit has held that the costs a well owner incurs in preventing loss of its well — even when the accident damages a third party's property and the well is not immediately involved — constitute recoverable property damage. *See Corpus Christi*, 71 F.3d at 202; *Pennzoil*, 943 F.2d at 1473. In *Corpus Christi*, which involved facts analogous to those in this case, the court held that a well owner could recover the cost of voluntarily flaring the gas in its well to save production capacity after a barge struck a third party's pipe connected to

[23] Def.'s Reply Mem. Supp. Mot. Summ. J., Rec. Doc. 40 at 4 (citing Decl. of W.H. Bagley, Nexen Petroleum Drilling Mgr., undated, Rec. Doc. 19-2 at 2).

[24] Decl. of W.H. Bagley, Nexen Petroleum Drilling Mgr., undated, Rec. Doc. 19-2 at 2.

[25] Rec. Doc. 19 at 5.

23

the well. Damage to the pipe required a halt in production, and without flaring its gas during the suspension, the well owner risked the well's collapsing and losing production capacity altogether. *Corpus Christi*, 71 F.3d at 200-02.

The Fifth Circuit, however, did not allow the well owner to recover consequential losses, such as the value of delayed production, resulting from damage to the property of a third party. The well owner in *Corpus Christi* sought to recover deferred production earnings, but the court limited its recovery to mitigation expenses. The court reasoned that the "gas remains in the ground, unaffected by the property damage suffered by' the well owner and thus economic loss for deferred production "occurred solely and only because of the physical damage" to the third party's property. *Corpus Christi*, 71 F.3d at 202.

In light of Bagley's affidavit statement, Nexen Offshore has raised a genuine issue of material fact as to the need to plug its well. Under *Corpus Christi*, Nexen Offshore's mitigation costs are not foreclosed by the proprietary interest requirement in *Robins Dry Dock* and *Testbank*, and it may recover for these expenses. Thus, Sea Mar is not entitled to summary judgment on this issue. But as to Nexen Offshore's claim for lost production revenues, the Court sees no meaningful distinction between the facts alleged in this case and the situation in *Corpus Christi*,

24

in which the Fifth Circuit denied the well owner's claim for the value of deferred production. Here, Nexen Offshores' lost production resulted from damage to the rig, not damage to the well.[26] Accordingly, the Court grants Sea Mar's motion for summary judgment with respect to Nexen Offshore's claim for economic loss from deferred production.

Sea Mar argues in the alternative that even if Nexen Offshore suffered damage to a proprietary interest, Nexen Petroleum is required to indemnify Sea Mar against Nexen Offshore's claims. Sea Mar contends that Nexen Petroleum "has a contractual agreement with Nexen Offshore to operate Nexen Offshore's lease"[27] and that Nexen Offshore is Nexen Petroleum's customer.[28] Yet it offers no evidence of such an agreement. Plaintiffs do not deny their relationship is contractual or that Nexen Petroleum operates the lease and pays the costs of

---

[26] The *Corpus Christi* court distinguished its holding on deferred production from *Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 772 F.2d 1217 (5th Cir. 1985). In that case, the court held that a plaintiff could recover for economic loss resulting from physical damage to *its* property. *See id.* at 1224. The *Corpus Christi* well owner's deferred production earnings were not caused by physical damage to its well, but by damage to the connecting pipe. *See Corpus Christi*, 71 F.3d at 203.

[27] Def.'s Stmnt. Uncontested Material Facts, Rec. Doc. 38-2 ¶ 5.

[28] *See* Def.'s Reply Mem. Supp. Summ. J., Rec. Doc. 40 at 8-9.

operations on behalf of Nexen Offshore. Rather, they deny that
there is a *written* contract between them and assert that Nexen
Petreoleum passes the operating costs through to Nexen Offshore
without markup.[29] In a signed affidavit, Nexen Petroleum's
Accounting Manager, David Hamilton, declares that the two
companies are "affiliated" and that "inter company accounts . . .
are settled annually" but that "Nexen Offshore does not pay Nexen
Petroleum for any products or services provided by Nexen
Petroleum."[30]

The nature of Nexen Offshore's relationship with Nexen
Petroleum is important because it determines whether Nexen
Petroleum has an obligation under the Master Time Charter to
indemnify Sea Mar for any damages to Nexen Offshore. As noted
above, Nexen Petroleum agreed that it would "defend, indemnify,
and hold harmless [Sea Mar] . . . from and against" any claim
"involving damage to or loss of any property . . . of charterer,
charterer's other subcontractors, [or] charterer's customers."[31]
The Court finds that the factual record is insufficient for it to

[29] Pl.'s Resp. Def.'s Stmnt. Uncontested Material Facts, Rec. Doc. 46 ¶ 5.

[30] Decl. David Hamilton, Nexen Petroleum Acct. Mgr., Dec. 12, 2006, Rec. Doc. 35-2 at 1-2.

[31] Sea Mar–Nexen Petroleum Master Time Charter ¶ 14, Rec. Doc. 19-4 at 4.

determine the nature of the relationship between the two Nexen companies. Plaintiffs have introduced affidavit testimony that at least creates an issue of fact as to whether Nexen Offshore was a customer of Nexen Petroleum's. Accordingly, Sea Mar is not entitled to summary judgment on this issue.

**B.   Nexen Petroleum and Nexen Offshore's Motion for Partial Summary Judgment**

In its cross-motion for partial summary judgment, Nexen Petroleum asks the Court to declare that even if the exculpatory/indemnification provisions of the Master Time Charter apply to their claims, Sea Mar may still be held liable for "gross negligence." In *Bisso v. Inland Waterways Corp.*, the Supreme Court recognized a public policy exception to contractual provisions "releasing towers from *all* liability for their negligence" and concluded that a party could still be held liable for its gross negligence, notwithstanding exculpatory contractual provisions. 349 U.S. 85, 90 (1955) (emphasis added). The Fifth Circuit has also endorsed the view that under the general federal maritime law, a party may not contractually stipulate out of liability for its gross negligence. *See Todd Shipyards Corp. v. Turbine Service, Inc.*, 674 F.2d 401, 410–11 (5th Cir. 1982) (reviewing shipyard's performance under contract for gross negligence despite presence of exculpatory provisions).

27

Indeed, Sea Mar concedes that exculpatory clauses do not limit liability for gross negligence. Nevertheless, it argues that Nexen Petroleum has not raised a genuine issue of material fact that Sea Mar was indeed grossly negligent and therefore the Court should grant summary judgment in its favor. But Nexen Petroleum alleges gross negligence in its complaint. And Sea Mar has not moved for summary judgment on this issue; it raised it for the first time in its reply brief.[32] Nexen Petroleum was not required to produce evidence on a motion dealing only with the legal issue of whether exculpatory clauses can apply to gross negligence. Nexen Petroleum has not asked for a ruling that Sea Mar was in fact grossly negligent, just a declaration that the clauses in issue do not limit Sea Mar's liability if Nexen Petroleum can prove gross negligence. In light of the law in this Circuit, Nexen Petroleum is entitled to summary judgment on this issue.[33]

---

[32] *See* Def.'s Reply Mem. Supp. Mot. Summ. J., Rec. Doc. 40 at 14.

[33] The validity of Nexen Petroleum's argument that gross negligence is a defense to the enforcement of the exculpatory/indemnification clasuses in the Master Time Charter is another reason why Sea Mar is not entitled to summary judgment on Nexen Petroleum's claim for lost charter hire paid to Global, nor on Nexen Offshore's claim for damage to its well hole.

## IV.   Conclusion

For the foregoing reasons, the Court (1) GRANTS Sea Mar's motion for summary judgment with respect to Nexen Petroleum's claims for unabsorbed overhead expenses arising out of damage to the *Arctic I* and claims arising out of damage to the drilling mud; (2) DENIES Sea Mar's motion for summary judgment on Nexen Petroleum's claim to recover the lost charter hire it paid Global; (3) DENIES Sea Mar's motion for summary judgment on Nexen Offshore's claim for damage to its well hole but GRANTS summary judgment in Sea Mar's favor on Nexen Offshore's claim to deferred production revenues; and (4) GRANTS Nexen Petroleum's cross-motion for partial summary judgment and declares that Sea Mar cannot escape liability under the Master Time Charter's exculpatory clauses if Nexen Petroleum proves gross negligence.

New Orleans, Louisiana, this <u>29th</u> day of June 2007.

_____

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

29