```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA


NEXEN PETROLEUM U.S.A., INC.           CIVIL ACTION
AND NEXEN OFFSHORE U.S.A., INC.

VERSUS                                 NO. 06-3043


SEA MAR DIVISION OF POOL               SECTION "R" (4)
WELL SERVICES CO.
```

### ORDER AND REASONS

Before the Court are defendant's motion for summary judgment For the following reasons, the Court DENIES defendant's motion.

**I.  Background**

**A.  Factual Background**

This case arises from the allision of a supply vessel with a semi-submersible rig at an offshore drilling site. The plaintiffs are Nexen Petroleum U.S.A., Inc. and Nexen Offshore U.S.A., Inc. Nexen Petroleum and Nexen Offshore are corporate affiliates wholly owned by Canadian-based Nexen, Inc. Nexen Offshore holds a federal lease giving it the right to explore and extract hyrdocarbons at a location offshore of Louisiana known as the Aspen 5 site. Nexen Petroleum operates the lease on behalf Nexen

Offshore. Nexen Petroleum contracted with Global Santa Fe, a provider of mobile offshore drilling rigs, for the use of Global's *Arctic I*, a semi-submersible rig, at the Aspen 5 site. It also chartered a supply vessel, the *Cape Hope*, from defendant Sea Mar to provide support services during drilling operations. Nexen Petroleum also contracted with several other service providers at the site.

On April 9, 2006, the *Cape Hope* was transferring drilling mud to the *Arctic I* via hoses suspended between the vessel and the rig. During the transfer, drilling muds began leaking onto the deck of the *Cape Hope*. In an attempt to stop the leak, the *Cape Hope*'s ship engineer on duty, Robert Purce, activated the emergency shut-down switch (ESD), cutting fuel to the vessel's engines and causing the ship to lose power. The *Cape Hope* then allided with the *Arctic I*, causing damage to the rig that ultimately resulted in the suspension of drilling operations. After the allision, operations personnel inserted two cement plugs into the well hole, and returned drilling equipment and support vessels to shore.

Nexen Petroleum and Nexen Offshore have brought breach of contract and negligence claims against Sea Mar. They seek damages for "increased and additional expenses, deferred and/or lost production, increased, additional and/or unabsorbed overhead, and

other physical and economic damages."[1] Nexen Petroleum asserts that Sea Mar did not fulfill its obligation under the charter to "exercise due diligence to see that the vessel is delivered and maintained in good running order and in a tight, staunch, strong, and in all respects a seaworthy condition," and that it failed to provide a "full compliment of master, officers and crew . . . in accordance with the vessel's dress, tonnage, and applicable U.S. Coast Guard regulations" as promised.[2] Plaintiffs also argue that Sea Mar's negligence caused damage to the *Arctic I*, resulting in economic losses to Nexen Petroleum, as well as the need to plug the partially drilled well hole at the Aspen 5 site to avoid loss of Nexen Offshore's well. They also contend that Sea Mar was grossly negligent.

Sea Mar contends that exculpatory provisions in the charter agreement for the *Cape Hope* shield it against any liability for damages caused by the allision. Sea Mar as the "Owner" and Nexen Petroleum as the "Charterer" agreed to the following terms:

> 14. CHARTERER'S INDEMNITIES
> NEITHER OWNER, ITS OFFICERS, DIRECTORS EMPLOYEES, THE VESSEL, HER OWNERS, OPERATORS, MASTER, AND CREW NOR THE UNDERWRITERS OF ANY OF THE FOREGOING SHALL HAVE ANY OF RESPONSIBILITY OR LIABILITY FOR ANY CLAIM INVOLVING DAMAGE TO OR LOSS OF ANY PROPERTY, DRILLING RIGS, VESSELS, CARGO, AND/OR EQUIPMENT OF CHARTERER, CHARTERER'S OTHER SUBCONTRACTORS, CHARTERER'S CUSTOMERS OR INVITEES OR FOR ANY

---

[1] *See* Pls.' Cmplt. at ¶ 14, R. Doc. 1 at 4.

[2] *See* "Master Time Charter Agreement" Def.'s Mot. Summ. Judgment Ex. A at ¶¶ 3(a), 7(a), R. Doc. 85-3 at 1, 2.

> INJURY, ILLNESS, DISEASE OR DEATH OF EMPLOYEES, AGENTS OR REPRESENTATIVES OF CHARTERER, CHARTERER'S OTHER SUBCONCTRACTORS, CHARTERER'S CUSTOMERS OR INVITEES AND CHARTERER SHALL DEFEND, INDEMNIFY, AND HOLD HARMLESS OWNER, ITS OFFICERS, DIRECTORS, EMPLOYEES, THE VESSEL, ITS OWNERS, OPERATORS, MASTER, AND CREW, AND THE UNDERWRITERS OF EACH OF THE FOREGOING FROM AND AGAINST ANY SUCH CLAIM, WHETHER GROUNDLESS OR NOT, AND WHETHER CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OR FAULT OF INDEMNITEES, OR BY UNSEAWORTHINESS OF THE VESSEL OR EQUIPMENT OF OWNER, OWNER'S PROPERTY OR OWNER'S SUBCONTRACTORS' PROPERTY. IT IS EXPRESSLY UNDERSTOOD THAT CHARTERER SHALL INSURE ITS OBLIGATIONS ASSUMED UNDER THIS PARAGRAPH.[3]

Sea Mar argues that Global Santa Fe is Nexen Petroleum's subcontractor, and therefore it is not liable to Nexen Petroleum for any claims involving damage to the *Arctic I*. Nexen Petroleum maintains that Global was its contractor, as is evidenced by the contract for the *Arctic I* that refers to Global as an "independent contractor." Sea Mar also argues that Nexen Offshore is Nexen Petroleum's customer, and therefore it has no responsibility for damage to the well hole. Nexen Petroleum, however, characterizes its relationship with Nexen Offshores as corporate affiliates acting under the direction of the parent company, not two parties engaged in an arms-length transaction.

### B. Procedural History

Earlier in this litigation the parties filed cross-motions for summary judgment. Sea Mar argued that under the rule in *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927), and

---

[3] *See id.* at ¶¶ 14-15, R. Doc. 85-3 at 4 (emphasis in original).

*Louisiana ex. rel. Guste v. M/V Testbank*, 752 F.2d 1019 (5th Cir. 1985), that a plaintiff may not recover economic losses or lost profits suffered as a result of damage to property in which it has no proprietary interest, plaintiffs were barred from losses resulting from damage to the *Arctic I*. It also argued that the exculpatory provisions of the charter agreement absolve it of liability for any damages arising from the allision.

The Court denied Sea Mar's motion in part and granted it in part. It concluded that consistent with the loss-shifting exception to *Robins Dry Dock* that the Fifth Circuit embraced in *Amoco Transport Co. v. S/S Mason Lykes*, 768 F.2d 659, 668 (5th Cir. 1985), Nexen Petroleum may recover the lost charter hire for the *Arctic I* while it was out of commission and undergoing repair because Nexen Petroleum and Global contractually shifted the burden of economic loss for damage to the rig to Nexen Petroleum.[4] The Court ruled, however, that Nexen Petroleum may not recover unspecified "unabsorbed overhead" expenses incurred while the rig underwent repair. Nexen Petroleum described these costs as "a certain percentage of the fixed expenses of the home office" that each of the company's projects is expected to account for or absorb[5]; in other words, general operating costs spread among various projects. Such costs are equivalent to lost

---

[4] *See* July 29, 2007 Order, R. Doc. 52 at 12-17.

[5] Bagley Aff., R. Doc. 19-2 at 3.

5

profits because they do not stem from the rig owner's rights, the Court explained.[6] The Court further held that under *Corpus Christi Oil & Gas Co. v. Zapata Gulf Marine Corp.*, 71 F.3d 198, 202 (5th Cir. 1995), Nexen Offshore may recover in tort the cost of temporarily plugging and abandoning (TP&A) the well hole as a mitigation expense. But it ruled that Nexen Offshore may not recover economic losses from delayed production.[7] The Court also concluded that it could not determine at the summary judgment stage whether Sea Mar could rely on the exculpatory provisions of the charter as a defense to plaintiffs' claims because the plaintiffs had raised issues of material fact about Nexen Petroleum's relationship with both Global Santa Fe and Nexen Offshore. Regardless of whether the clauses could be enforced, the Court concluded that Sea Mar could not escape liability for gross negligence under these provisions.

Sea Mar now submits an additional motion for summary judgment. Sea Mar revives its arguments about the applicability of the exculpatory provisions in the charter agreement. It contends that various contracts between Nexen Petroleum and other companies involved in drilling operations conclusively establish that Global Santa Fe was a subcontractor of Nexen Petroleum's, not Nexen Petroleum's contractor. Therefore, Sea Mar argues, the

---

[6] *See* R. Doc. 52 at 17.

[7] *See* R. Doc. 52 at 24.

exculpatory provisions of the charter agreement bar Nexen Petroleum from holding Sea Mar liable for any damage to Global Santa Fe's rig. Sea Mar also argues that other deposition testimony establishes that Nexen Offshore is indeed Nexen Petroleum's customer, and therefore the exculpatory provisions insulate it from liability for Nexen Offshore's damages. Additionally, Sea Mar contends that the plaintiffs have failed to adduce sufficient evidence to establish gross negligence.

## II.  LEGAL STANDARD

Summary judgment is appropriate when there are no genuine issues of material facts, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To grant summary judgment, the Court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagra Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

The moving party bears the burden of establishing that there are no genuine issues of material fact. *See Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex*,

477 U.S. at 322-25). To do so, it may simply point out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim or defense. *See Celotex*, 477 U.S. at 325; *Lavespere*, 910 F.2d at 178. The burden then shifts to the nonmoving party, who must set out specific facts showing that a genuine issue exists by submitting or referring to evidence already in the record, not resting upon mere allegations in the pleadings. *See Triple Tee Golf*, 485 F.3d at 261 (citing *Celotex*, 477 U.S. at 321-25; *Anderson*, 477 U.S. at 255-57).

The Fifth Circuit has "arguably articulated an even more lenient standard for summary judgment in certain nonjury cases." *Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 273 n.15 (5th Cir. 1987). In *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1123-24 (5th Cir. 1978), the Fifth Circuit explained that

> [i]f decision is to be reached by the court, and there are no issues of witness credibility, the court may conclude on the basis of the affidavits, depositions, and stipulations before it, that there are no genuine issues of material fact, even though [its] decision may depend on inferences to be drawn from what has been incontrovertibly proved.

Therefore, in a nonjury case, such as this case, the Court is encouraged to draw inferences, even when they appear to be factual, if a "trial on the merits would reveal no additional data." *Id.* at 1124; *see also Prof. Geophysics, Inc. v. Placid Oil Co.*, 932 F.2d 394, 398 (5th Cir. 1991).

**III. DISCUSSION**

    **A.    Interpretation of Maritime Contracts**

As a preliminary matter, it is well-established that a charter agreement is a maritime contract. *See Morewood v. Enequist*, 64 U.S. 491 (1860); *see also Stolt-Nielsen SA v. Celanese AG*, 430 F.3d 567, 572 (2d Cir. 2005). Courts typically employ federal common law to resolve maritime disputes. *Albany Ins. Co. v. Anh Thi Kieu*, 927 F.2d 882, 886 (5th Cir. 1991). Additionally, the charter agreement between Nexen Petroleum and Sea Mar at issue specifies that it "shall be construed in accordance with the admiralty and maritime laws of the United States of America."[8] The Fifth Circuit has looked to "general rules of contract law" in interpreting charter agreements such as the one in this case. *Marine Overseas Services, Inc. v. Crossocean Shipping Co., Inc.*, 791 F.2d 1227, 1234 (5th Cir. 1986). The *Marine Overseas* Court noted that "since most points of charter law involve construction of the charter, the principles are much the same as those of ordinary contract law." *Id.* (quoting G. Gilmore & C. Black, *The Law of Admiralty* § 4-1 at 196 (2d ed. 1975)). The Court then looked to the Restatement (Second) of Contracts for general principles of contract law. *Id.*

    Courts interpret maritime contracts, as they do other

---

[8] *See* "Master Time Charter Agreement" at ¶ 26, R. Doc. 104-7 at 5.

contracts, by looking first to the intent of the parties as expressed by the terms of the agreement. *See, e.g., Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1214 (5th Cir. 1986) (re-affirming that courts should look first to the expressed intent of the parties when interpreting indemnity clauses); see also 22 Williston on Contracts § 58:9 (4th ed.). A maritime contract "should be read as a whole, and a court should not look beyond the written language of the contract to determine the intent of the parties unless the disputed language is ambiguous." *Fontenot*, 791 F.2d at 1214. If the language of the contract is ambiguous, a court may consider extrinsic evidence to determine the intention of the parties at the time of contract. *Atlantic Lines, Ltd. v. Narwhal, Ltd.*, 514 F.2d 726, 730 (5th Cir. 1975).

B.   **Nexen Petroleum's Relationship with Global Santa Fe**

The Court previously denied summary judgment on the issue of whether the charter agreement's exculpatory provisions insulated Sea Mar from liability because Global Santa Fe was a "subcontractor." The Court observed that both Sea Mar and Global Santa Fe appeared to be in the same position vis-a-vis Nexen Petroleum, as Nexen Petroleum had contracted with each company to provide services at the well site. The Court ruled, however, that Nexen Petroleum had raised an issue of fact about the intent of the parties to the Master Time Charter and the actual nature of its relationship with Global Santa Fe.

The Fifth Circuit recognizes that "[a] subcontractor is one who takes a portion of a contract from the principal contractor or another subcontractor." *Avondale Indus., Inc. v. Int'l Marine Carriers, Inc.*, 15 F.3d 489, 494 (5th Cir. 1994). In support of its argument that Global Santa Fe was in fact Nexen Petroleum's subcontractor, Sea Mar has submitted evidence that indicates that several of the other service providers at the drilling site were under contracts with Nexen Petroleum, not Global Santa Fe.[9] Nexen Petroleum is the operator of the lease, although the lessee is its sister company, Nexen Offshore. Both companies are wholly owned by the same parent company, Nexen, Inc. Nexen Offshore has no employees and apparently exists only to hold the lease for tax purposes. The lessee has the right to explore for and develop oil and gas on the leased premises. Ordinarily, when the operator owns an interest in the lease and hires a service provider to participate in drilling operations, the relationship between the operator and the service provider is not viewed as a subcontract.

The question here is whether Nexen Petroleum's role as a non-lessee operator on behalf of Nexen Offshore makes Nexen Petroleum a general contractor in its dealings with Global. Sea Mar's motion does not demonstrate the absence of fact issues on this point or that it is entitled to judgment as a matter of law

---

[9] *See* Bagley Dep., Def.'s Mot. Summ. J. Ex. D, R. Doc. 85-6 at 5-6; Fugro Chance Docs., Def.'s Mot. Summ. J. Ex. G, R. Doc. 85-9.

11

that Nexen Petroleum was the general contractor at the site. Sea Mar has not produced a contract between Nexen Petroleum and Nexen Offshore that would give rise to an inference that Nexen Petroleum was acting as principal contractor for the Aspen 5 site. Nor has it produced evidence that Nexen Petroelum acted in a role other than that of a typical operator. Sea Mar points to the absence of any subcontracts between Global and other service providers at the Aspen 5 site, but this does not, by itself, mean that Nexen Petroleum as the operator acted as a general contractor for the drilling operations so as to render Global a subcontractor.

Under federal maritime law, "a court may not look beyond the written language of the document to determine the intent of the parties unless the disputed contract provision is ambiguous." *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 332-33 (5th Cir. 1981). Applying the rule that the words in a maritime contract should be "given their plain meaning unless the provision is ambiguous," *Weathersby v. Conoco Oil Co.*, 752 F.2d 953, 955 (5th Cir. 1984), the charter agreement specifically shields Sea Mar against liability for damage to the property of Nexen Petroleum's *subcontractors*, not any entity with whom Nexen Petroleum may have had an agreement. Sea Mar has not demonstrated as a matter of law that Global is a subcontractor under the agreement. Accordingly, summary judgment on this issue is denied.

**B.     Nexen Petroleum's Relationship with Nexen Offshore**

The Court also previously denied summary judgment on the issue of whether Nexen Petroleum has an obligation under the charter agreement to indemnify Sea Mar against claims brought by Nexen Offshore. The charter agreement states that Nexen Petroleum shall indemnify Sea Mar against claims involving damage to or loss of any property of Nexen Petroleum's customers. Sea Mar argues that Nexen Offshore is Nexen Petroleum's customer because Nexen Petroleum operated the lease at the site on Nexen offshore's behalf, and Nexen Offshore reimburses Nexen Petroleum for all of the direct expenses and for 92 percent of the indirect expenses it incurs in operating the lease.[10]

Sea Mar bears the burden of establishing that Nexen Offshore was a customer of Nexen Petroleum's for the indemnity provision to apply. It failed earlier to demonstrate that it was entitled to summary judgment on this issuer, and nothing it has submitted now changes this. In its first order, the Court observed that Sea Mar had failed to introduce any evidence of a contract creating a customer relationship between Nexen Petroleum and Nexen Offshore. Nor has Sea Mar produced any evidence of such an agreement now. Instead, it argues that since Nexen Petroleum operates the lease on behalf of Nexen Offshore, the latter must be a customer. It

---

[10] *See* Def.'s Mem. Supp. Mot. Summ J., R. Doc. 85-2 at 9; Dreger Dep. at 36, R. Doc. 85-10 at 9.

has produced no evidence of arms-length dealings, a negotiated price for Nexen Petroleum's services or other indicia of a traditional customer relationship. The evidence shows that accounts for both corporations are maintained in one accounting office and that Nexen Petroleum passes operational costs directly to Nexen Offshore, which are then transferred to other entities wholly owned by the parent corporation.[11] This evidence does not present any new information that was not before the Court in the earlier motions. Sea Mar has cited no law that indicates a customer relationship exists between Nexen Petroleum and Nexen Offshore under the circumstances present here. Maritime indemnity provisions are to be interpreted narrowly. *See Corbitt,* 654 F.2d at 333; *accord Babcock v. Continental Oil co.*, 792 F.2d 1346, 1351 n.5 (5th Cir. 1986) (noting that courts "are bound by controlling precedent to read narrowly the indemnity clauses in [maritime] contracts"). Accordingly, Sea Mar is not entitled to summary judgment on this issue.

    **C.   Plaintiffs' Claims of Gross Negligence**

In its earlier order, the Court ruled that even if the exculpatory provision of the master charter agreement between Sea Mar and Nexen Petroleum apply to the plaintiffs' claims, these provisions would not absolve Sea Mar of liability if plaintiffs prove gross negligence. Sea Mar now argues that the plaintiffs

---

[11] *See* Dreger Dep. at 27, R. Doc. 87-3 at 8.

have failed to adduce any evidence that Sea Mar, the crew of the *Cape Hope*, or Purce, the ship engineer who activated the emergency shutdown switch, were grossly negligent.

Since this Court's jurisdiction is grounded in admiralty, it is "guided by general principles of negligence law." *Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir. 1987). In maritime cases, the Fifth Circuit recognizes gross negligence as "harm willfully inflicted or caused by gross or wanton negligence." *Coastal Iron Works, Inc. v. Petty Ray Geophysical Div. of Geosources, Inc.*, 783 F.2d 577, 582 (5th Cir. 1986) (quoting *Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401, 411 (1982) (quoting 6A *Corbin on Contracts* § 1472 (1964 ed.))); *see also Black's Law Dictionary* 1057 (7th ed. 1999) (defining gross negligence as "[a] lack of slight diligence or care . . . [a] conscious, voluntary act or omission in reckless disregard of a legal duty").

Plaintiffs argue that Sea Mar maintained deficient safety and training protocols with respect to the emergency shutdown switch aboard the *Cape Hope* and specifically that Purce received inadequate training on, and orientation to, the vessel. They highlight a section of the procedural manual for mud transfer — the activity leading to the shutdown of the ship's engines — that allegedly directs crew members to activate the vessel's main emergency shutdown switch to stop the mud pump. Plaintiffs also

cite deposition testimony of Sea Mar employees that the emergency shutdown switch should not have been activated to stop the leakage of muds. Plaintiffs also argue that the 15-20 minute period of orientation that Purce underwent was inadequate, particularly since he was on his first voyage on the *Cape Hope*. They further contend that the emergency switch was not housed in a glass casing or outfitted with proper markings as required by Coast Guard regulations. Finally, they point to the deposition testimony of Donald McBee, the ship engineer responsible for training Purce, who indicated that he had reserved judgment about Purce's competence during the two weeks between when Purce first came aboard the ship and the date of the allision.

Although the Court doubts that this evidence will amount to gross negligence at trial, it concludes that it is necessary to hear the evidence in context to reach that conclusion. A determination of whether a defendant's conduct constitutes "gross" as opposed to "ordinary" negligence "depends on the particular circumstances of each case." *Todd Shipyards*, 674 F.2d at 411. Individual pieces of evidence might not alone establish gross negligence, but the evidence may cumulatively show reckless conduct. Further, plaintiffs point to some evidence that suggests Sea Mar was on notice that Purce was unfit to serve as a crew member. The Court will have to hear all of the evidence to determine whether Sea Mar's conduct constituted ordinary

negligence in any event. Because factual issues remain to be resolved, Sea Mar is not entitled to summary judgment that it was not grossly negligent.

**IV.  CONCLUSION**

For the foregoing reasons, the Court DENIES defendant's motion for summary judgment.

New Orleans, Louisiana, this <u>25th</u> day of September 2007.

*Sarah Vance*
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE